1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

11
12
13
14
15
16
17
18
19
20

| | |
|---|---|
| MARTIN BULNES,<br><br>                              Plaintiff,<br><br>        v.<br><br>SUEZ WTS SERVICES USA, INC., f/k/a<br>GE MOBILE WATER, INC.,<br><br>                              Defendant. | Case No. 22-cv-1154-BAS-AHG<br><br>**ORDER:**<br><br>**(1)  GRANTING DEFENDANT'S<br>      MOTION TO COMPEL<br>      ARBITRATION; and**<br><br>**(2)  GRANTING DEFENDANT'S<br>      MOTION TO DISMISS**<br><br>**(ECF No. 13)** |

21
22
23
24
25

        Now before this Court is Defendant Suez WTS Services USA, Inc. ("Suez WTS")'s motion to compel to arbitration the individual claims of its former employee, Plaintiff Martin Bulnes ("Bulnes"), and to dismiss claims Bulnes brings on behalf of a putative class ("Motion").  (Mot., ECF No. 13.)  Bulnes opposes (Opp'n, ECF No. 15) and Suez WTS replies (Reply, ECF No. 17).[1]  The Court finds the Motion suitable for

26
27
28

---

        [1] Bulnes also raises numerous evidentiary objections in a separately filed document.  (Objections to Evidence, ECF No. 15-2.)  Those objections largely parrot evidentiary arguments raised in the body of Bulnes' Opposition.  This Court's Standing Order for Civil Cases requires that "objections to

determination on the papers submitted and without oral argument.  *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).  For the reasons stated below, the Court **GRANTS** the Motion.

## I.    BACKGROUND

Suez WTS is a Virginia-based company that designs, installs, and maintains water-treatment systems nationwide.  (Declaration of John Couch ("Couch Decl.") ¶¶ 6–8, Ex. 4 to Mot., ECF No. 13-4.)  It is wholly owned by a Pennsylvania-based parent company.  (*Id.* ¶ 7.)  Suez WTS has operations in California, including San Diego.  (*Id.* ¶ 2.)  Suez WTS employed Bulnes, a California resident, as a Service Technician from approximately December 2019 through March 2021.[2]  (*Id.* ¶ 5.)  Bulnes worked in San Diego on the company's California projects.  (*Id.* ¶ 2.)

Approximately one year after his employment ended, Bulnes sued Suez WTS in San Diego Superior Court on June 7, 2022, alleging Suez WTS pervasively violated numerous wage-and-hour provisions of the California Labor Code and the Industrial Welfare Commission Wage Orders during his employment.  (Compl., Ex. C to Not. of Removal ("Not."), ECF No. 1-3.)  The Complaint contains 10 claims.  (*Id.*)  Nine are brought under various provisions of the Labor Code, while the tenth is a claim asserting unlawful business practices under California Business & Professions Code § 17200 predicated upon the alleged Labor Code violations.  (*Id.* ¶¶ 54–124.)  Bulnes presses these claims on behalf of not only himself but also a putative class of similarly situated current and former Suez WTS employees.  (*Id.* ¶¶ 13–17.)

Suez WTS removed the action to federal court in August 2022, alleging subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).  (*See* Not. ¶ 10, ECF No. 1.)  Suez then filed the present Motion, seeking to compel arbitration of Bulnes' individual claims and to dismiss his putative class-action claims.

---

evidence submitted in support of an opposition must be contained *within* the reply brief."  Hon. Cynthia A. Bashant Standing Order for Civil Cases ("Standing Order") § 4(I) (emphasis added).  "No separate statements of objections will be allowed." *Id.*  Accordingly, the Court strikes Bulnes' separately filed Objections and considers only those evidentiary arguments set forth in the Opposition itself.

[2] The parties appear to dispute whether Bulnes left his employment voluntarily. However, it is not necessary to resolve this issue of fact for the purpose of the present Motion.

(Mot.)  Approximately two weeks later, Bulnes moved to remand the case back to San Diego Superior Court, contesting Suez WTS' Notice of Removal failed to establish the amount-in-controversy in this action exceeds $5,000,000, as required under CAFA. (Mot. to Remand, ECF No. 14.)

In accordance with well-settled law, this Court addressed Bulnes' Motion to Remand first.  *See, e.g.*, *Petersen-Dean, Inc. v. SolarWorld Ams., Inc.*, No. 3:17-cv-7326-WHO, 2018 WL 1151731, at *3 (N.D. Cal. Mar. 5, 2018) ("I will first address PDI's motion to remand because I must have jurisdiction before I can address defendants' motion to dismiss or compel arbitration.").  On February 23, 2023, this Court denied the Motion to Remand, finding it had subject-matter jurisdiction over the instant action pursuant to CAFA.  (Order, ECF No. 23.)  Having satisfied itself of its subject-matter jurisdiction, the Court now proceeds to the instant Motion:  Suez WTS' request to compel arbitration of all 10 of Bulnes' claims and to dismiss Bulnes' putative class-action claims. (Mot.)

Suez WTS argues its Motion should be granted because Bulnes agreed to arbitrate claims arising out of his employment and to waive his right to bring claims on a class-wide basis when he accepted Suez WTS' offer of employment in November 2019.  (*See generally* Mem. in Supp. of Mot. ("Mem.") , Ex. 1 to Mot., ECF No. 13-1.)  Bulnes contends there is no admissible proof he ever formed an agreement with Suez WTS to arbitrate or to waive class claims and that, even assuming *arguendo* such proof does exist, any such agreement is either unenforceable or exempt from the Federal Arbitration Act.  (*See generally* Opp'n.)

The parties proffer competing evidence in support of their positions.

### A.   Suez WTS' Evidence

Suez WTS proffers two declarations from two of its employees:  one from John Couch ("Couch Declaration") and one from  Matt Webb ("Webb Declaration").  (*See* Couch Decl.; Webb Decl., Ex. 3 to Mot., ECF No. 13-3.)  Through these declarations, Suez WTS also submits several employment documents for this Court's review.

### 1. The Couch Declaration and the Solutions Procedure

John Couch ("Couch") is a Human Resource Manager for Suez WTS' California operations.  (Couch Decl. ¶ 2.)  Couch attests that, by virtue of his role at Suez WTS, he is "familiar with the [company's] employment policies regarding arbitration agreements." (*Id.* ¶ 4.)  Specifically, he attests that Suez WTS "uses a procedure called 'SOLUTIONS: An Alternative Dispute Resolution Procedure'" to resolve disputes between Suez WTS and prospective, current, and former employees "through binding arbitration" ("Solutions Procedure").  (*Id.* ¶ 4.)  He further attests, "All Suez WTS prospective employees . . . are informed of this condition in their offer letters."  (*Id.*)

Annexed as Exhibit A to the Couch Declaration is a copy of the Solutions Procedure, which Couch attests "ha[s] been maintained in the ordinary course of business," and to which he has access as a Human Resource Manager.  (Solutions Procedure, Ex. A to Couch Decl., ECF No. 13-4.)

The Solutions Procedure starts with a broad description of its purpose:  to "create[e] a binding obligation on Covered Employees"—defined later in the Policy— and Suez WTS "for the resolution of employment disputes."  (Solutions Procedure § I.) The Solutions Procedure creates "a structured dispute resolution procedure that consists of two internal levels of review followed by, if necessary and applicable, outside mediation (Level III) and arbitration (Level IV)."  (*Id.* § II.A.)  "The levels of Solutions are in a logical sequence, and [Covered Employees] must complete each level of the process before proceeding to the next level."  (*Id.*)

The Solutions Procedure provides, in pertinent part:

> At Levels I and II, an employee and the management team meet in an attempt to address the employee's concern.  If the employee is not satisfied with the outcome of Levels I and II, and the concern is a Covered Claim, the employee may submit the claim to Level III.  Similarly, if the Company has a Covered Claim against an employee, it would be submitted initially at Level III [. . . .]  At Level III, an external mediator helps the employee and the Company open lines of communication in an attempt to facilitate the resolution.

> If there is no resolution at Level III and the party wishes to pursue the concern, the next step is Level IV arbitration.  At Level IV, an external arbitrator provides the employee and the Company with a binding decision on the merits of the Covered Claim(s).

(*Id.* (alteration added).)

The Solutions Procedure defines "Covered Employees" as all "U.S-based . . . current or former employees who left the Company after the effective date of Solutions, not represented by a labor union." (Solutions Procedure § I.E.)  The "effective date of Solutions Procedure" is July 1, 2008.  (Solutions Procedure, App. A.)  The Solutions Procedure defines "Covered Claims" as:

> all claims that arise or arose out of or are or were related to an employee's employment or cessation of employment (whether asserted by or against the Company), where a court or agency in the jurisdiction in question would otherwise have the authority to hear and resolve the claim under any federal, state or local (e.g., municipal or county) statute, regulation or common law.

(Solutions Procedure Policy § II.I.)  It goes on to list a non-exhaustive collection of Covered Claims, including "[c]laims relating to compensation."  (*Id.*)  It also lists "Excluded Claims" that are exempted from Levels III and IV of the policy, none of which is apposite here.  (*Id.* § II.J.)

The Solutions Procedure explicitly forbids Covered Employees and Suez WTS itself from "litigat[ing] a Covered Claim in any court."  (Solutions Procedure § II.K.)  Resolution of such Claims must follow the above-mentioned tiered structure set forth in the Solutions Procedure, which requires mediation and then arbitration.  (*Id.*; *see id.* § II.E ("Covered Employees continue to be obligated to use Solutions (*including Level IV*) following termination of their employment with respect to any and all Covered Claims they may have." (emphasis added)).)  The Solutions Procedure also contains a class-action and -arbitration waiver, which states, in pertinent part:

> Covered Employees and the Company waive their right to bring any Covered Claims as, or against, a representative or member of a class or

22cv1154

collective action (whether opt-in or opt-out) or in a private attorney general capacity, unless all parties agree to do so in writing. All Covered Claims must be brought on an individual basis only in solutions.

(*Id.*)[3] However, this provision expressly states "[a] court shall have the sole authority to determine the enforceability of the waiver." (*Id.*) If a court finds the waiver unenforceable, "any claims brought as a putative collective, class or representative (e.g., private attorney general actions) action will be considered Excluded Claims that must be pursued (if at all) in court." (*Id.*)

The Solutions Procedure also details the rules and parameters governing arbitration of Covered Claims, including the award of attorneys' fees and costs to the prevailing party. (*See generally* Solutions Procedure § III.D.) The Solutions Procedure provides, in pertinent part, "Each party shall pay its experts' and/or attorneys' fees unless the arbitrator awards reasonable experts' and/or attorneys' fees to a 'prevailing party' under applicable law." (*Id.* § III.D.28.)

Finally, the Solutions Procedure contains a severability provision. (Solutions Procedure § II.O.) That provision states:

> In the event that any provision of this Procedure is determined to be legally invalid, unenforceable, and cannot be modified to be enforceable, the affected provision shall be stricken from the Agreement. The remaining terms of the Agreement and its enforceability shall remain unaffected, except as noted in Section II.K in the event that a court determines the waiver of the right to bring a class, collective, or representative action is unenforceable.

(*Id.*)

The Solutions Procedure does not instruct its reader to sign or otherwise indicate agreement to its terms. Couch attests "[a]ll Suez WTS prospective employees and

---

[3] To avoid confusion, the Court refers throughout to the waivers collectively as the "class waiver."

current employees are informed" of the Solution Procedures' binding arbitration policy and class waiver "in their offer letters." (Couch Decl. ¶ 4.)

### 2. The Webb Declaration and Bulnes' Signed Offer Letter

Matt Webb ("Webb") is Suez WTS' Director of Talent Acquisitions. (Webb Decl. ¶ 2.) According to Webb, he is familiar with both Suez WTS' processes for hiring and onboarding prospective employees and the program Suez WTS utilized to effectuate those processes at the time it hired Bulnes. (*Id.* ¶¶ 2–3, 6.) Webb attests that, from October 2017 through February 2022, Suez WTS employed a human-resource web interface called "Talent'Up" to onboard prospective employees.[4] (*Id.* ¶ 4.) Webb attests that, as a matter of practice, once Suez WTS extended an offer to a prospective employee, it transmitted employment documents, including an offer letter and a copy of the Solutions Procedure, to that individual via Talent'Up. (*Id.* ¶ 6.) Talent'Up would simultaneously and automatically generate and send to the prospective employee "an email link directing the individual to create a unique username and passcode" for his or her Talent'Up profile. (*Id.* ¶ 6.) According to Webb, "[n]o one other than the individual to whom the secure link is sent may access the interface for creating the username and passcode[,]" and a prospective employee needed to create these credentials as a prerequisite to gaining access to the Talent'Up interface. (*Id.*) Once the prospective employee "created [his or her] unique username and passcode, the individual c[ould] then log into the Talent'Up interface to review the documents sent to [him or her], including the [o]ffer letter, Solutions Procedure, and any other onboarding documents." (*Id.*)

Webb further attests that when a prospective employee opened his or her offer letter on Talent'Up, the interface would prompt the individual with the option to "click 'accept' or 'reject' in response to the [o]ffer letter." (Webb Decl. ¶ 8.) "Once the individual click[ed] 'accept[,]' [he or she would be] prompted to affix his or her electronic signature by signing his or her name at the end of the offer letter." (*Id.*) Once

---

[4] Like Couch, Webb also annexes as Exhibit A to his Declaration a copy of the Solutions Procedure. All exhibits to the Webb Declaration are located at ECF No. 13-3.

the prospective employee entered an electronic signature, Talent'Up would then prompt the individual to "Save and continue" in order to submit the signed offer letter to Suez WTS. (*Id.*)   According to Webb, "[o]nce an employment offer has been electronically accepted, it is Suez WTS' practice to export the completed documents . . . and save them in the individual's personnel file." (*Id.* ¶ 11.)

In addition to being familiar with the Suez WTS hiring process in general, Webb also attests he is familiar with the process for onboarding Bulnes based upon his review of Bulnes' personnel files. (Webb Decl. ¶¶ 9–10, 12.)   He represents that Suez WTS adhered to standard protocol in all respects when it hired Bulnes. (*Id.*)   Specifically, he attests that, on November 19, 2019, Suez WTS sent Bulnes his Offer Letter, Solutions Procedure, and other employment documents via Talent'Up, and that Talent'Up sent to Bulnes' personal email address a secured link that enabled him to create credentials to access Talent'Up. (*Id.* ¶ 9.)   Webb attests Bulnes used that link to create a unique username and passcode, electronically sign the Offer Letter, and submit his acceptance of the Offer Letter to Suez WTS through Talent'Up that same day. (*See id.* ¶¶ 9–10.)

Annexed as Exhibit B to the Webb Declaration is a copy of the Offer Letter Bulnes purportedly signed and that Suez WTS saved in Bulnes' personnel file.[5]   (Offer Letter, Ex. B to Webb Decl.)   The Offer Letter begins by extending Bulnes the Service Technician position at Suez WTS' San Diego office and providing Bulnes' anticipated compensation. (Offer Letter at 1.)   Below that first paragraph the Offer Letter states, in pertinent part:

---

[5] Bulnes objects to the Offer Letter, *inter alia*, on foundation grounds, arguing that because Webb neither personally onboarded him nor actually witnessed Bulnes sign the Offer Letter, it cannot be admitted as evidence. (Opp'n at 4.)   That objection is overruled.   This document is admissible as a business record under Federal Rule of Evidence 803(6) because Webb attests:  (1) the Offer Letter was generated contemporaneously with the event it was intended to record, (2) Suez WTS keeps and maintains offer letters—including Bulnes'—"in the regular course and scope of business" and, (3) as Suez WTS' Director of Talent Acquisition, he is the custodian of such records. (Webb Decl. ¶ 3); *see Trevino v. Acosta, Inc.*, No. 17-CV-06529 NC, 2018 WL 3537885, at *4 (N.D. Cal. July 23, 2018) (noting that electronically signed arbitration agreements are admissible under Fed. R. Evid. 803(6) where human resources personnel familiar with the record-keeping practice authenticate the record).

By signing this offer letter you agree that your offer of employment is contingent upon you successfully meeting **all** employment requirements, including the following:

\*       \*       \*       \*

- Your review and agreement to "SOLUTIONS: An Alternative Dispute Resolution Procedure" (the "Solutions Procedure"), through which you agree to resolve disputes in accordance with the terms of the Solutions Procedure and, accordingly, agree that, as a condition of your employment, to waive the right to pursue Covered Claims (as defined in the Solutions Procedure) against the Company in Court (bench or jury trial) or on a class basis in Court or arbitration. Your signature on this offer letter constitutes your acknowledgment of your receipt and review of a copy of the agreement to the Solutions Procedure.[6]

("Arbitration Provision"). (*Id.* at 1 (emphasis in original).) In essence, the Arbitration Provision mandates Bulnes to arbitrate his own Covered Claims pursuant to the rules delineated by Solutions Procedure and contains a class waiver. (*Id.*) The Offer Letter further provides "to the extent that you live and work in California at the time that you are hired and at the time that any dispute arises between you and the Company, your Solutions claim will be governed by California law (notwithstanding any Solutions provision to the contrary)." (Offer Letter at 2.)

The Offer Letter's second page contains a signature block. Printed in that block is an electronic signature that reads, "Martin Octavio Bulnes," dated November 19, 2019. (Offer Letter at 2.) According to Webb, given the security procedures employed by Talent'Up, the electronic signature on the Offer Letter "could only have been placed [there] by a person using the unique username and confidential passcode connected to

---

[6] The Offer Letter lists thirteen other conditions of employment. (Offer Letter at 1–2.) Several of those conditions also concern arbitration. (*Id.*, Bullet Point No. 6 (providing that (a) Bulnes is required to accept an arbitrator's award as final and (b) Bulnes has the option of bringing Excluded Claims to arbitration if he wishes).)

22cv1154

[Bulnes'] personal email address identified in [Paragraph 7 of the Webb Declaration]." (Webb Decl. ¶ 12.)

Annexed as Exhibit C to the Webb Declaration is an email that Talent'Up automatically generated and sent to Suez WTS' human-resources team on November 19, 2019 ("Talent'Up Offer Response").[7]  (Talent'Up Offer Response, Ex. C to Webb Decl.) The Talent'Up Offer Response indicates an individual using Bulnes' Talent'Up credentials accepted the Offer Letter. (*Id.* (listing under "Offer [D]etails" the candidate's name as "Martin Bulnes").)

### B.   Bulnes' Evidence

Bulnes proffers his own declaration in opposition to the Motion ("Bulnes Declaration"). (Bulnes Decl., Ex. 1 to Opp'n, ECF No. 15-1.) In it, he attests:

> 3.    I do not recall logging into Defendant's online portal to sign any documents in November 2019, including any agreement to arbitrate.
>
> 4.    I would not have agreed to a waiver [of] my right to bring an action against Defendant in a court.

(*Id.* ¶¶ 3, 4.)

## II.   LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to "contract[s] evidencing a transaction involving commerce." 9 U.S.C. § 2.  The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2.  The "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are

---

[7] While not raised by Bulnes, the Court observes Webb is not one of the recipients of the Talent'Up Offer Response. (*See* Talent'Up Offer Response.)  Still, the Webb Declaration contains sufficient facts to enable this Court to conclude the Talent'Up Offer Response is admissible under Federal Rule of Evidence 803(6).  (*See* Webb Decl. ¶ 3 ("In connection with my duties, I can request and am able to view the offer letters provided to applicants, the processes for delivery of those letters to applicants, and the processes for acceptance of those letters by applicants.  This information is kept and maintained in the regular course and scope of business at Suez WTS.")); *see Trevino*, 2018 WL 3537885, at *4.

- 10 -

enforced according to their terms." *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Sections 3 and 4 of the FAA give force to this purpose by enabling a party who is bound to an arbitration agreement that falls within the scope of the FAA, as set forth in Sections 1 and 2, to move to compel arbitration in a federal court. 9 U.S.C. §§ 1–4; *see also Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).

In determining whether to grant a motion to compel a party to arbitration, a district court's inquiry is limited to (1) whether a valid agreement to arbitrate exists and, if so, (2) whether the agreement covers the relevant dispute. *See* 9 U.S.C. § 4; *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). As to the first line of inquiry, courts generally "apply ordinary state-law principles that govern the formation of contracts" to decide "whether the parties agreed to arbitrate a certain matter[.]" *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Arbitration agreements, "[l]ike other contracts . . . may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). The party seeking arbitration has "the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommc'ns Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

As to the second line of inquiry, the strong preference in favor of arbitration ensconced by judicial precedent dictates that, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."). "In the absence of any

express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85 (1960).  The party opposing arbitration "bears the burden of demonstrating the language in the collective bargaining agreement excludes a particular dispute from arbitration."  *Phoenix Newspapers, Inc. v. Phoenix Mailers Union Local 752, Int'l Bhd. of Teamsters*, 989 F.2d 1077, 1080 (9th Cir. 1983).

Once it determines that a claim is covered by a written and enforceable arbitration agreement, "a district court has little discretion to deny an arbitration motion." *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991).  But "[w]hile a court's authority under the [FAA] to compel arbitration may be considerable, it [is not] unconditional."  *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).  To invoke the statutory power to compel arbitration pursuant to a contract's terms, "a court must first know whether the contract itself falls within or beyond" the parameters of the FAA drawn in Sections 1 and 2.  *Id.*  A district court "should decide for itself" this issue "before ordering arbitration." *Id.*

## III.   ANALYSIS

The decision whether to grant Suez WTS' Motion largely rests upon the outcome of three inquires:  (A) whether Suez WTS and Bulnes entered into an agreement to arbitrate and to waive class claims that is both (1) valid and (2) enforceable; (B) whether that agreement covers the claims underlying this action; and (C) whether the agreement falls within or outside the scope of the FAA, as drawn by Sections 1 and 2.

### A.   There Exists a Valid and Enforceable Agreement to Arbitrate

#### 1.   Formation Framework

"[A] party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate." *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140 (9th Cir. 1991) (emphasis in original).  That issue is left for the district court

to decide.  *Id.*  Courts must apply state law in determining whether a valid contract to arbitrate exists.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *see also Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) ("To evaluate the validity of an arbitration agreement, courts should apply ordinary state-law principles that govern the formation of contracts.").  The parties agree California law governs.

"A contract is . . . an exchange of promises."  *Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1005 (2016) (quoting *In re Marriage of Feldner*, 40 Cal. App. 4th 617, 623 (1995)).  Under California law, "the essential elements for a contract are (1) '[p]arties capable of contracting;' (2) '[t]heir consent;' (3) '[a] lawful object;' and (4) '[s]ufficient cause or consideration.'"  *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999) (alterations in original) (quoting Cal. Civ. Code § 1550); *see also Shaw v. Regents of Univ. of Calif.*, 58 Cal. App. 4th 44, 52–53 (1997).  Bulnes argues Suez WTS has failed to satisfy its burden of establishing he assented to the terms of the Offer Letter, including the Arbitration Provision.  (Opp'n at 4–5.)  Thus, this case hinges upon the second element of contract formation under California law:  the parties' consent.

"There is no contract until there is mutual consent of the parties."  *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (citing Cal. Civ. Code §§ 1550, 1565).  "Mutual assent is determined under an objective standard applied to the outward manifestation of the parties, *i.e.*, the reasonable meaning of their words and acts, and not their unexpressed intentions and understandings."  *Alexander v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002).  Mutual consent is typically shown through establishing that:  (1) the offeror communicated an offeree and (2) the offeree subsequently communicated an acceptance to the offeror.  *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001).

"An offer is the manifestation of the willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to the bargain is invited and will conclude it."  *City of Moorpark v. Moorpark Unified Sch. Dist.*, 54 Cal. 3d 921, 930 (1991).  "The objective manifestation of the party's assent ordinarily controls, and

the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer." *Donovan*, 26 Cal. 4th at 271. "The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances." *Id.* However, regardless of an offeree's "apparent manifestation of consent," the offeree is not "bound by inconspicuous contractual provisions of which [the offeree] was unaware, contained in a document whose contractual nature is not obvious." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972); *see also Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001) (instructing that a party is not bound by a document where it "does not appear to be a contract and the terms are not called to the attention of the recipient").

The second part of contract formation is acceptance. One form of acceptance is a signature to an agreement. *See Marin Storage*, 89 Cal. App. 4th at 1049. "Ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms." *Id.* This is so "whether or not the party was aware" of all the instrument's terms. *Norcia*, 845 F.3d at 1284; *see also Marin Storage*, 89 Cal. App. 4th at 1049 ("A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing.").

In California, an electronic signature is a valid form of acceptance. *See* Cal. Civ. Code § 1633.7(c); *see Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1069 (2016) ("Under Civil Code section 1633.7, enacted in 1999 as part of the uniform Electronic Transactions Act, an electronic signature has the same legal effect as a handwritten signature." (cleaned up) (quoting *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836, 843 (2014))). A movant "is not required to authenticate an opposing party's signature on an arbitration agreement as a preliminary matter in moving for arbitration or in the event the authenticity of the signature is not challenged." *Espejo*, 246 Cal. App. 4th at 1059 (emphases omitted) (quoting *Ruiz*, 232 Cal. App. 4th at 846;

*see also Condee v. Longwood Mgmt. Corp.*, 88 Cal. App. 4th 215, 217–19 (2001). However, when the authenticity of an electronic signature is contested, the burden of proof shifts to the movant to prove by a preponderance of the evidence that the signature is, indeed, authentic. *Espejo*, 246 Cal. App. 4th at 1059 (interpreting *Condee*, 88 Cal. App. 4th at 215 and *Ruiz*, 232 Cal. App. at 836; collecting authorities).

"While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.'" *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)). Where the making of an agreement is at issue, "[c]ourts have employed a summary judgment approach" and ruled "as a matter of law where there are no genuine issues of material fact." *Geoffroy v. Wash. Mut. Bank*, 484 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007); *see also Three Valleys Mun. Water Dist.*, 925 F.3d at 1141 (indicating agreement with the Third Circuit that, where there is a doubt as to whether an agreement to arbitrate exists, the matter should be submitted to a jury and "[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did not enter into such an agreement").

### 2.     Formation Principles Applied to Bulnes' Offer Letter

Suez WTS has carried its burden of establishing the formation of a contract between itself and Bulnes that contains an agreement to arbitrate and to waive class claims because no reasonable factfinder could find otherwise based on the evidence presented to this Court.

### a.     Suez WTS Made an Offer Containing an Agreement to Arbitrate

On the record before it, this Court is satisfied Suez WTS has shown that it communicated to Bulnes, and that Bulnes received, an offer of employment contingent upon his agreement to, *inter alia*, arbitrate any subsequent Covered Claims that might

arise pursuant to the Solutions Procedure and to waive his right to bring Covered Claim on a class-wide basis.[8]  It established this first requirement of assent by proffering the Webb Declaration, the Offer Letter, and the Talent'Up Offer Response.   These documents establish that on November 19, 2019:  Suez WTS transmitted to Bulnes a packet of onboarding documents via Talent'Up, including the Offer Letter and Solutions Procedure; that it sent to Bulnes' personal email address a secured link to create credentials to access Talent'Up and review those documents; and that someone using Bulnes' unique credentials accessed Talent'Up to electronically sign the Offer Letter with Bulnes' name and to submit the signed Offer Letter to Suez WTS.   Bulnes does not attest the email address to which Webb represents Talent'Up sent a secured link is not his.   Nor does Bulnes attest he did not receive such a link.  (*See generally* Bulnes Decl.)  Together, the   documents provided by Suez WTS, and the lack of rebuttal evidence from Bulnes, form a sufficient factual basis for this Court to find Bulnes, in fact, received the Offer Letter, including the Arbitration Provision, and the Solutions Procedure.

Suez WTS also demonstrates Bulnes had ample reason to believe Suez WTS intended the Offer Letter, including the Arbitration Provision, to manifest its willingness to offer Bulnes a position as Service Technician at the company, subject to his agreement to certain terms and conditions of employment, including the Arbitration Provision.  *See City of Moorpark*, 54 Cal. 3d at 930.  As an initial matter, the Offer Letter looks like an employment contract.  *See Olivas v. Hertz Corp.*, No. 17-cv-1083-BAS-NLS, 2018 WL 1306422, at *7 (S.D. Cal. Mar. 12, 2018) (examining the form and content of a communication to determine whether plaintiff had reason to believe it constituted an offer).  It is filled with terms for Bulnes' ensuing employment and provides a space for

---

[8] The Court construes Bulnes' sweeping argument that he did not receive, review, or sign the Offer Letter as one contesting the authenticity of the electronic signature affixed to the Offer Letter proffered by the Webb Declaration.  (*See* Opp'n at 4–5; *see also* Bulnes Decl. ¶ 3 (attesting he does not "recall" accessing Talent'Up to sign an employment document).)   It addresses that argument in determining whether Bulnes manifested assent at *infra* Sec. III.A.2.b.

Bulnes' signature.  It begins, "Dear Martin:  I am pleased to *offer* you the position of Service Technician for [Suez WTS]."  (Offer Letter at 1 (emphasis added).)

Furthermore, the Arbitration Provision, including its class waiver, is not an inconspicuous contractual clause.  It is located on the Offer Letter's first page, beneath the second paragraph, which is an umbrella paragraph that states, "By signing this offer letter you agree that your offer of employment is contingent upon you successfully meeting **all** employment requirements."  (Offer Letter at 1.)  The Offer Letter calls the reader's attention to these employment requirements and their importance by applying emphasis (bold) as a literary device.  (*Id.*)  The Arbitration Provision is the fifth of 14 bullet points delineating Suez WTS' employment requirements.  (*Id.* (emphasis in original).)  The Arbitration Provision makes explicit mention of the Solutions Procedure using all capitalizations—the only word in the entire Offer Letter drafted in a different-sized font than the surrounding text.  (*Id.*)

Bulnes' multi-year relationship with Suez WTS is perhaps the best indication he understood Suez WTS made him an offer on November 19, 2019.  *See Donovan*, 26 Cal. 4th at 271 (instructing courts to examine the "surrounding circumstances" to determine whether a communication is an offer).  Suez WTS sent Bulnes the Offer Letter over its human-resources interface after he had applied to the company.  The Offer Letter indicates that Bulnes' "start date is December 16, 2019."  (Offer Letter at 1.)  Bulnes does not dispute, and, in fact, attests, he began working for Suez WTS that exact day. (Bulnes Decl. ¶ 2.)  He continued to work at the company as a Service Technician—the position Suez WTS offered him in the Offer Letter—for over a year.  (*Compare* Offer Letter at 1 *with* Bulnes Decl. ¶ 2.)  Bulnes offers no explanation for what he reasonably could have understood the Offer Letter to manifest given these circumstances besides an offer of employment.

Accordingly, a reasonable factfinder could conclude only that, by sending Bulnes an Offer Letter on November 19, 2019, Suez WTS made Bulnes an offer to enter into an

22cv1154

employment contract that included an agreement to arbitrate his own claims and to waive his right to bring claims on a class-wide basis.

### b.    Bulnes' Electronic Signature Constitutes Acceptance

As proof of Bulnes' assent to the Offer Letter and its underlying agreement to arbitrate and class waiver, Suez WTS proffers the Offer Letter bearing Bulnes' electronic signature.  (Offer Letter at 2; *see* Mem. at 8 ("Here, a valid agreement to arbitrate exists between the parties.  Plaintiff electronically signed the Offer Letter which explicitly acknowledged that he accepted the terms of the employment, including the Solutions Procedure."); *see also* Reply at 4–5.)

Bulnes contends the electronic signature does not establish his assent because Suez WTS fails to show the signature is actually his.  (Opp'n at 4–6.)  Put differently, Bulnes contests the authenticity of the electronic signature affixed to his Offer Letter.  In support, Bulnes attests he does not recall ever logging into Talent'Up to view or sign any employment document, and that he never would have signed any document containing a waiver provision.  (Bulnes Decl. ¶¶ 3–4.)  Because Suez WTS has adequately demonstrated the authenticity of the signed Offer Letter, this Court finds Bulnes' argument does not carry water and, therefore, rejects it.

Under California Civil Code Section 1633.9 ("Section 1633.9"), "[a]n electronic record or signature is attributable to a person if it was the act of the person."  Section 1633.9(a) "addresses how a proponent of an electronic signature may authenticate the signature—that is, show the signature is, in fact, the signature of the person the proponent claims it is." *Espejo*, 246 Cal. App. 4th at 1061 (citation omitted).  Section 1633.9(a) provides that attribution of an electronic signature "may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable."  Cal. Civ. Code § 1633.9(a).  The authenticity of an electronic signature is presumptively valid. *See Espejo*, 246 Cal. App. 4th at 1059.  However, when a purported signatory calls into question the authenticity of that electronic signature, including by attesting he or she

cannot recall signing the document, the burden shifts to the drafter to establish the electronic signature's authenticity in accordance with Section 1633.9(a). *Id.*; *see also Nanavati v. Adecco USA, Inc.*, 99 F. Supp. 3d 1072, 1076 (N.D. Cal. 2015) ("[T]he *Ruiz* court found that the employer bears the burden of proof to authenticate a signature once the employee contests the validity of the arbitration agreement.").

Two California cases are particularly illustrative of Section 1633.9(a)'s standard. *Ruiz v. Moss Bros. Auto Group, Inc.*—a case to which Bulnes cites heavily in his Opposition—elucidates the evidentiary benchmark a party seeking to compel arbitration must surpass to authenticate an electronic signature. 232 Cal. App. 4th at 836. There, the defendant-employer, "Moss," sought to compel to arbitration the wage-and-hour claims of its plaintiff-employee, "Ruiz." As evidence Ruiz had agreed to arbitration, Moss proffered an employment contract with Ruiz's electronic signature containing an arbitration clause. However, Ruiz, like Bulnes, attested that he did not recall signing the agreement and that he would not have signed an agreement limiting his ability to sue his employer had it been presented. The *Ruiz* court construed Ruiz's inability to recall as a challenge to the authenticity of the electronic signature, thereby shifting the burden to Moss to demonstrate the electronic signature affixed to the agreement had been placed there by Ruiz himself. *Id.* at 840.

Moss attempted to satisfy Section 1633.9(a) by proffering two declarations of its business manager. In the first one, the business manager "summarily asserted . . . that Ruiz was the person who signed the . . . agreement . . . but did not explain how she arrived at that assertion." In the second, the business manager explained the signed agreement "was part of an employee acknowledgment form that 'is' presented to all [employees] . . . and each employee is required to log into the company's HR system, using his or her 'unique login ID and password,' to review and sign the acknowledgment form." *Ruiz*, 232 Cal. App. 4th at 840.

But the *Ruiz* court held that, taken together, these declarations were deficient under Section 1633.9(a), despite the relative leniency of that standard. 242 Cal. App. 4th at 844

(characterizing the Section1633.9(a) standard as "not a difficult" one).  The declarations "left a critical gap" in the evidence supporting the motion to compel because Moss's business manager failed to "explain how, or upon what basis, [she] inferred that the electronic signature on the [employment] agreement was 'the act of' Ruiz." *Id.* at 844 (quoting Cal. Civ. Code § 1633.9(a)).  This critical gap, the *Ruiz* court opined, included the absence of attestations from the business manager that:  (1) "an electronic signature in the name of [an employee] could only have been placed on the [agreement] . . . by a person using [the employee's] unique login ID and password"; (2) "that the date and time printed next to the electronic signature indicated the date and time the electronic signature was made"; and (3) "that *all* [Moss's] employees were required to use their unique login ID and password when they logged into the HR system and signed electronic forms." *Id.*  Simply put, Moss's business manager's declaration was bereft of evidence that would enable the Court to conclude the "efficacy of the security procedures" adequately ensured the electronic signature on the employment agreement was placed there by an act of Ruiz.  *See* Cal. Civ. Code § 1633.9.  Without such evidence, the *Ruiz* court determined it could find the critical element of Ruiz's assent.

By contrast, *Espejo v. Southern California Permanente Medical Group* provides a blueprint for what a movant's declaration must demonstrate to satisfy Section 1633.9(a).  246 Cal. App. 4th at 1047.  In all relevant aspects, *Espejo* is factually indistinguishable from *Ruiz* and the instant case.  The defendant-employer, "SCPMG," sought to enforce an arbitration provision against its former employee, "Espejo," contained in an employment agreement the parties purportedly entered into.  That agreement bore an electronic signature in Espejo's name.  Like Bulnes, Espejo attested he did not recall seeing or signing, electronically or otherwise, the agreement.  *Id.* at 1054.  Following *Ruiz*, the *Espejo* court held Espejo's inability to recall triggered SCPMG's obligation to authenticate the signed agreement as required by Section 1633.9(a).  *Id.* at 1059–60 (citing *Ruiz*, 232 Cal. App. 4th at 844).

22cv1154

To authenticate Espejo's electronic signature, SCPMG proffered two declarations of one of its human-resources employees.  These declarations filled the "critical gaps" that doomed the motion to compel in *Ruiz*.  Unlike the declarations proffered by Moss in *Ruiz*, they "detailed SCPMG's security precautions regarding transmission and use of an applicant's unique username and password."  *Espejo*, 246 Cal. App. 4th at 1062.  In particular, the declarations stated that, once SCPMG made a prospective employee an offer, it would send the prospective employee an email containing a link to a secure webpage; access to that webpage "require[d] the use of a private and unique username and password, both of which [would be] provided by phone directly and orally to the applicant." *Id.* at 1054.  An applicant who successfully accessed the webpage would then be prompted to reset his or her credentials; without completing this step, he or she could not proceed to the next webpage housing the employment documents. *Id.*

And unlike the declarations proffered by Moss in *Ruiz*, SCPMG's described "the steps an applicant would have to take to place his or her name on the signature line of the employment agreement." *Espejo*, 246 Cal. App. 4th  at 1062.   The *Espejo* declarations stated that once that a prospective employee accessed the employment documents, the webpage would execute a prompt directing the applicant to "either accept or decline the employment agreement." *Id.* at 1054.  If the prospective employee accepted, he or she "was prompted to complete his [or her] name as he [or she] would sign it.  Whatever name he [or] she typed into this entry is what populated on the signature line of the contract.  Once that information was input and accepted . . . the employment agreement was finalized, including [the prospective employee's] name, date, time, and the IP address . . ." *Id.*

The *Espejo* court found that, given SCPMG's standard procedures for accessing and signing employment agreements, and the fact SCPMG had adhered to its usual approach in onboarding Espejo, it was satisfied the electronic signature on the employment agreement could only have been placed there by someone with Espejo's unique and secured credentials to do so. *Espejo*, 246 Cal. App. 4th at 1062.  These

22cv1154

factual details, the *Espejo* court opined, "offered the critical factual connection that the declarations in *Ruiz* lacked.," and enabled it to conclude the electronic signature on the agreement was placed there by Espejo. *Id.* Accordingly, the *Espejo* court found that Espejo's electronic signature manifested his assent to the employment agreement and its terms, including the arbitration clause. *Id.*

Without articulation, Bulnes asserts the Webb Declaration's attestations are indistinguishable from those found to be deficient in *Ruiz.* (Opp'n at 4–5.) This Court disagrees. The attestations in the Webb Declaration bear striking similarity to those offered by SCPMG in *Espejo*. Like the declarations at issue in *Espejo*, the Webb Declaration details the "security precautions regarding transmission and use of an applicant's unique username and password" Suez WTS employed at the time Bulnes was hired. Webb attests that, when Suez WTS made an offer of employment, it would transmit over Talent'Up a packet of documents, including an offer letter and a copy of the Solutions Procedure, which would prompt Talent'Up to "sen[d] automatically . . . an email link directing the [prospective employee] to create a unique username in order to access the Talent'Up interface." (Webb Decl. ¶ 6.) "No one other than the individual to whom the secure link [wa]s sent may access the interface for creating the username and passcode." (*Id.*) Once the prospective employee to whom the link was sent created his or her unique credentials, he or she "c[ould] then log into [Talent'Up] to review the documents sent to [him or her], including the [o]ffer [l]etter." (*Id.*)

And like SCPMG's declarations in *Espejo*, the Webb Declaration details "the steps an applicant would have to take to place his or her name on the signature line" of a Suez WTS offer letter. *See Espejo*, 246 Cal. App. 4th at 1062. Webb describes that, once a prospective employee was "ready to accept the employment offer, the individual [was] permitted to click 'accept' or 'reject' in response to the [o]ffer [l]etter. Once the individual click[ed] 'accept' they [would be] prompted to affix his or her electronic signature by singing his or her name at the end of the offer letter." (Webb Decl. ¶ 8.) Talent'Up would then prompt the prospective employee with a button entitled "Save and

continue." (*Id.* ¶ 8.) Webb attests it is "Suez WTS' general practice" to contemporaneously make a "personnel record" of a prospective employee's acceptance or rejection of an offer of employment and export the signed or unsigned offer letter to the individual's "personnel file." (*Id.* ¶¶ 3, 12.) Moreover, once a prospective employee completed the signing process, Talent'Up contemporaneously generated an automated email indicating the result of the transaction, which it would send to Suez WTS' human-resources department. (*Id.* ¶ 10.)

Crucially, Webb attests that Bulnes' onboarding process mirrored Suez WTS' general practice. (Webb Decl. ¶¶ 9–12.) Talent'Up sent to Bulnes' personal email address on November 19, 2019 a secure link to create a unique username and passcode to gain Bulnes access to the Talent'Up platform page where his employment documents, including the Offer Letter and Solutions Procedure, resided. (*Id.* ¶ 9.) Again, without such credentials, Webb attests Bulnes could not have accessed, reviewed, or signed the employment documents. And only someone with credentials generated using the link sent to Bulnes' personal email could have accessed the Talent'Up page containing Bulnes' employment documents. (*Id.*)

That same day, a signed Offer Letter linked to the unique username and confidential passcode associated with Bulnes' personal email address was uploaded to Talent'Up; the Offer Letter bore Bulnes' electronic signature and was dated November 19, 2019. (*See Id.* ¶¶ 9, 11; Offer Letter; Talent'Up Offer Response.) Talent'Up then automatically sent the Offer Response to Suez WTS' human-resources team, alerting it that Bulnes had accepted his offer of employment. (Talent'Up Offer Response; *see* Webb Decl. ¶ 12.)

The factual details proffered in the Webb Declaration about the efficacy of Suez WTS' security procedures leave no "critical gap" unfilled. They provide the necessary factual predicate to enable this Court to find the electronic signature on the Offer Letter was "the act of" Bulnes himself. *See* Cal. Civ. Code § 1633.9(a).

22cv1154

Bulnes retorts his inability to recall signing the Offer Letter is sufficient evidence to rebut an authenticated, signed Offer Letter. He is wrong. Bulnes' inability to recall was sufficient to shift to Suez WTS the burden of establishing Bulnes' electronic signature is authentic under Section 1633.9(a), which, as discussed above, Suez WTS satisfied. *See Espejo*, 246 Cal. App. 4th at 1059. But Bulnes' inability to recall "is insufficient on its own to rebut evidence of his properly authenticated e-signature." *See Lira v. Nat'l Distrib. Ctrs., LLC*, No. EDCV 21-672 JGB (KKx), 2021 WL 6693934, at *4 (C.D. Cal. Dec. 22, 2021) (citing *Rogers v. THD At-Home Servs., Inc.*, No. EDCV 14-02069 JGB (SPx), 2015 WL 12862912, at *4 (C.D. Cal. July 21, 2015)).

Bulnes also asserts this Court cannot find he consented to the terms of the Offer Letter, including its Arbitration Provision, given his attestation he would not have signed the Offer Letter had he known the legal implications of doing so. (Bulnes Decl. ¶ 4.) This argument cannot be squared with a "cardinal rule of contract law": "that a party's failure to read a contract, or to carefully read a contract, before signing it is no defense to the contract's enforcement." *Desert Outdoor Advert. v. Superior Court*, 196 Cal. App. 4th 866, 872 (2011). "[C]ourts must presume parties understood the agreements they sign, and that parties intended whatever the agreement objectively provides, whether or not they subjectively did." *Roldan v. Callahan & Blaine*, 219 Cal. App. 4th 87, 93 (2013), *as modified* (Sept. 18, 2013).

Finally, Bulnes argues that despite the signed Offer Letter, there exists no agreement to arbitrate because he did not sign the Solutions Procedure, which detail the scope and rules of Suez WTS' arbitration policy.[9] But the Solutions Procedure is not itself a contract. Rather it is a policy document incorporated by reference into a contract.

---

[9] The linchpin of Bulnes' argument appears to be his contention the Solutions Procedure contains a signature block at the end of it, which does not bear Bulnes' signature, electronic or otherwise. *See* Opp'n at 9 ("[A]t the end of the Solutions Procedure there is a signature block that Plaintiff did not sign.").) This assertion is false. The Solutions Procedure does not provide a place to sign. It appears Bulnes has mistaken a signature block contained in a sample claim-submission sheet attached as an appendage to the Solutions Procedure as a signature block applicable to the Solutions Procedure as a whole.

It is widely accepted that "a contract . . . may include provisions that are not physically part of the basic document so long as those provisions are sufficiently incorporated by reference." *Kleveland v. Chi. Title Ins. Co.*, 141 Cal. App. 4th 761, 765 (2006) (citing *Wolschlager v. Fidelity Nat'l Title Ins. Co.*, 111 Cal. App. 4th 784, 790 (2003)). "[T]he doctrine of incorporation by reference generally 'requires that (1) the reference to another document was clear and unequivocal; (2) the reference was called to the attention of the other party, who consented to that term; and (3) the terms of the incorporated documents were known or easily available to the contracting parties.'" *Yu v. Liberty Surplus Ins. Corp.*, 30 Cal. App. 5th 1024, 1032 (2018) (quoting *Kleveland*, 141 Cal. App. 4th at 765). The Offer Letter's incorporation of the Solutions Procedure satisfies each of these requirements.

The Offer Letter makes "clear and unequivocal" reference to the Solutions Procedure. The first sentence of the Arbitration Provision refers to the Solutions Procedure by name, stating that, by signing the Offer Letter, Bulnes indicates he "review[ed] and agree[d]  to SOLUTIONS: An Alternative Dispute Resolution Procedure." (Offer Letter at 1.) Furthermore, the location of the Arbitration Provision and the font deployed to refer to the Solutions Procedure supports a finding that the Offer Letter adequately draws attention to the Solutions Procedure document. *Cf. Baba v. Hewlett Packard Co.*, No. C 09-5946 RS, 2012 WL 5336971, at *5 (N.D. Cal. Oct. 26, 2012) (considering placement and font as relevant factors in considering whether a provision in an agreement is a conspicuous one (citing *Logan Equip. Corp. v. Simon Aerials, Inc.*, 736 F. Supp. 1188, 1197 (D. Mass. 1990))). The Arbitration Provision appears in its own paragraph, and the Offer Letter uses capitalizations as a literary device to draw Bulnes' attention to the Solutions Procedure document. (Offer Letter at 1.) Notably, the Solutions Procedure is the only extraneous document to which the Offer Letter refers. (*See generally* Offer Letter.) Finally, it would be an understatement to say the Solutions Procedure was easily accessible to Bulnes; Suez WTS demonstrates that it directly sent Bulnes a copy alongside his Offer Letter. (Webb Decl. ¶¶ 6, 9.)

Accordingly, Suez WTS has established by a preponderance of the evidence Bulnes manifested his assent to the Offer Letter and its terms, including the Arbitration Provision. Thus, here exists a valid agreement to arbitrate and a class waiver between the parties.

### c.    Formation-Related Discovery is not Warranted

Lastly, Bulnes essentially argues this Court should stop short of rejecting his arguments going towards formation and, instead, should allow both parties to take discovery limited to the issue of formation. (Opp'n at 4, 12–13.)

Federal Rule of Civil Procedure ("Rule") 26 governs the scope of discovery in cases before a federal district court. That Rule provides any matter related to a claim or defense is discoverable. Fed. R. Civ. P. 26(b)(1). However, the scope of discoverable information typically permitted in civil actions under Rule 26(b)(1) is circumscribed by the FAA, which only permits discovery attendant to a motion to compel if "the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 726 (9th Cir. 1999) (quoting 9 U.S.C. § 4.)

Here, the making of an arbitration agreement is not "in issue." There is no genuine issue of fact concerning Bulnes' assent to the Offer Letter, including the Arbitration Provision. Bulnes' reliance upon his Declaration does not dictate otherwise. Bulnes' shaky recollection of whether he logged into Talent'Up and signed the Offer Letter "does not logically contradict" the authenticated Offer Letter put forward by Suez WTS. *See Schmidt v. Citibank, N.A.*, 28 Cal. App. 5th 1109, 1122 (2018) (citing *Joseph E. Di Loretto, Inc. v. O'Neill*, 1 Cal. App. 4th 149, 160 (1991)). Just as failing memories do not absolve a party from obligations set forth in a contract that bears the mark of his or her assent, neither does it create a triable issue of fact to warrant discovery and protracted litigation under Section 4 of the FAA. *See e.g.*, *Fed. Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002) (deploying summary-judgment standard, and finding inability to recall does not create a triable issue of fact); *cf. Kutluca v. PQ New York Inc.*,

266 F. Supp. 3d 691, 699 (S.D.N.Y. 1991) (citing *Vardanyan v. Close-Up Int'l, Inc.*, 315 F. App'x 315, 318 (2d Cir. 2009)).

Accordingly, Bulnes' request for discovery is denied.

### 3.    Enforceability of the Arbitration Provision and the Solutions Procedure

"Like other contracts, arbitration agreements can be invalidated for fraud, duress, or unconscionability." *Chavarria v. Ralphs Grocery Co.*, 733 F.3d 916, 921 (9th Cir. 2013). Bulnes argues Suez WTS cannot enforce the parties' agreement to arbitrate because to do so would be unconscionable. (Opp'n at 7–12.)

"Under California law, a contract must be procedurally and substantively unconscionable to be rendered invalid." *Chavarria*, 733 F.3d at 922 (citing *Armendariz v. Found. Health Psychare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)). Courts analyze "unconscionability on a sliding scale, so that the more substantively one-sided the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa." *Davis v. Kozak*, 53 Cal. App. 5th 897, 905 (2020). The party resisting enforcement of an arbitration provision, including on unconscionability grounds, has the burden of proving unconscionability. *See Pinnacle Museum Tower Ass'n v. Pinnacle Market Dev. (US), LLC*, 55 Cal. 4th 223, 236 (2012); *see also Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1023 (9th Cir. 2016).

#### a.    Procedural Unconscionability

Procedural unconscionability "concerns the manner in which the contract was negotiated and the circumstances of the parties at the time." *Gatton v. T-Mobile USA, Inc.*, 152 Cal. App. 4th 571, 581 (2007) (citing *Kenney v. United HealthCare Servs., Inc.*, 70 Cal. App. 4th 1322, 1329 (1999)). "The procedural element of an unconscionable contract generally takes the form of a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071 (2003) (citation and internal quotation marks omitted).

The analysis also focuses on "oppression or surprise." *Gatton*, 152 Cal. App. 4th at 581 (citing *Armendariz*, 24 Cal. 4th at 114). "Oppression arises from an inequality of bargaining power that results in no real negotiation and an absence of meaningful choice." *Id.* (citing *Flores v. Transam. HomeFirst, Inc.*, 93 Cal. App. 4th 846, 853 (2001)). "Surprise is defined as 'the extent to which the supposedly agreed-upon terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (quoting *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532 (1997)).

### i.   Contract of Adhesion

A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal. 4th at 113. Bulnes contends the Offer Letter is a contract of adhesion. (Opp'n at 11.)

An employment contract that imposes an agreement to arbitrate as a condition typically is adhesive. *See OTO, L.L.C. v. Kho*, 8 Cal. 5th 111, 126 (2019); *see also Serpa v. Cal. Surety Investigations, Inc.*, 215 Cal. App. 4th 695, 704 (2013) ("It is well settled that adhesion contracts in the employment context, that is, those contracts offered to employees on a take-it-or-leave-it basis, typically contain some aspects of procedural unconscionability."). "Ordinary contracts of adhesion, although they are indispensable facts of modern life that are generally enforced[, *see Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 817–18 (2007)], contain a degree of procedural unconscionability even without any notable surprises, and 'bear within them the clear danger of oppression and overreaching[,]' [*id.*, at 818]." *Baltazar v. Forever 21, Inc.*, 62 Cal. 4th 1237, 1244 (2016). This is particularly true with respect to contracts of employment. When an employment agreement contains an agreement to arbitrate, "the economic pressure exerted by employers on all but the most sought-after-employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement." *Armendariz*, 24 Cal. 4th at 115.

However, even within the employment context, the economic pressures attendant to contracts of adhesion, standing alone, typically entail "a fairly low level of procedural unconscionability." *Cisneros Alvarez v. Altamed Health Servs. Corp.*, 60 Cal. App. 5th 572, 591 (2021) (citing *Serafin v. Balco Props. Ltd., LLC*, 235 Cal. App. 4th 165, 174–75 (2015)); *see Davis*, 53 Cal. App. 5th at 907 ("By itself, however, adhesion establishes only a 'low' degree of procedural unconscionability." (citing *Serpa*, 215 Cal. App. 4th at 704)).

Thus, while it is indisputable the Offer Letter is a "contract of adhesion" as Bulnes asserts, it evinces "only *some* degree of procedural unconscionability, and is not itself a ground for finding that a contract, or one of its provisions, is unenforceable." *See Esquer v. Educ. Mgmt. Corp.*, 292 F. Supp. 3d 1005, 1014 (S.D. Cal. 2017) (citing *Sanchez v. Valencia Holding Co., LLC*, 61 Cal. 4th 899, 914 (2015)). "[O]rdinary contracts of adhesion" such as the Offer Letter require "closer scrutiny of [their] overall fairness" only when there is some "greater degree of procedural unconscionability" in the form of oppression or surprise. *See Baltazar*, 62 Cal. 4th at 1246. Therefore, the Court turns to Bulnes' other claim of procedural unconscionability: surprise.

### ii.  Surprise

"Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the printed terms." *A&M Produce Co. v. FMC Corp.,* 135 Cal. App. 3d 473, 486 (1982) (cleaned up); *see OTO*, 8 Cal. 5th at 128 (describing as "a paragon of prolixity" a two-page contract containing "extremely small font" and nearly illegible text, and finding the arbitration clause hidden in a 51-line "single dense paragraph" to be surprising). The element of surprise must be balanced against the fact that California law does not obligate a drafter to highlight an arbitration clause nor specifically call that clause to the reader's attention. *Sanchez*, 61 Cal. 4th at 914. Imposition of such a requirement would be preempted by the FAA. *Id.*; *but see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347 n.6 (2011) ("States remain free to take steps addressing the concerns that attend

contracts of adhesion—for example, requiring class-action-waiver provisions in adhesive arbitration agreements to be highlighted.").

Bulnes argues the Arbitration Provision is hidden within the Offer Letter. (Opp'n at 9.) He cites to one case, *Tiri v. Lucky Chances, Inc.*, 226 Cal. App. 4th 231, 245 (2014), but it is inapposite. In *Tiri*, the court found procedurally unconscionable a *delegation clause* within an arbitration agreement, despite the clause being "clear and unmistakable," because "the issue of delegating arbitrability questions to an arbitrator is a 'rather arcane' issue upon which parties likely do not focus" when presented with an agreement. *Id.* at 246 (emphasis added). Bulnes does not aver the Offer Letter contains a hidden and, thus, surprising delegation clause; it is the Arbitration Provision itself he seeks to invalidate. To the extent Bulnes argues *Tiri* stands for the premise a drafter must affirmatively draw the signatory's attention to an arbitration provision, he cites no case in support nor can this Court locate one. Indeed, any such rule would likely clash with the FAA. *See Concepcion*, 563 U.S. at 339 ("The final phrase of § 2, however, permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.' This savings clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as . . . unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.").

Moreover, the Court disagrees with the premise put forward by Bulnes that the Offer Letter is a "prolix printed form" in which the Arbitration Provision is "hidden." (Opp'n at 9.) Based on the appearance of the Offer Letter, the Court concludes there is nothing surprising about the Arbitration Provision therein. The Offer Letter spans a mere one-and-a-half pages and contains normal-sized texts. And for the reasons already elaborated at *supra* Sec. III.A.2.a, this Court finds the Arbitration Provision to be sufficiently conspicuous.

Bulnes more prominently argues it was procedurally unconscionable for Suez WTS to provide the Solutions Procedure—its arbitration policy and rules document—"as

part of a new hire packet" as opposed to delineating "substantive information about what agreeing to arbitrate entails" within the body of the Offer Letter.  (Opp'n at 10.)  A cursory survey of pertinent decisional law, however, reveals this asserted legal premise is faulty.  A contract that contains an agreement to arbitrate may incorporate by reference a separate document delineating the rules that govern any ensuing arbitration.  Only when the employer fails to attach those rules, or provides them after the signing date, is procedural unconscionability present.  *See Harper v. Ultimo*, 113 Cal. App. 4th 1402, 1406 (2003) (holding elements of surprise and oppression present when arbitration rules incorporated by reference into a consumer contract were not attached thereto and "customer is forced to go to another source to find out the full import of what he or she is about to sign"); *Fitz v. NCR Corp.*, 118 Cal. App. 4th 702, 721 (2004) (holding surprise present where the arbitration agreement did not contain provisions describing the rules and scope of the arbitration, but directed the party to obtain a copy through management or the human resources department); *see also De Souza v. Pulte Home Corp.*, No. Civ. S-08-337 LKK/GGH, 2008 WL 11385594, at *4 (E.D. Cal. Oct. 9, 2008) ("Surprise also exists where the drafter of the agreement incorporated by reference provisions, but makes it difficult for the other party to obtain the contents of those provisions." (citing *Fitz*, 118 Cal. App. 4th at 721)).

As this Court already determined at *infra* Sec. III.A.2.b, Suez WTS has adequately shown not only that the Offer Letter sufficiently incorporates by reference the Solutions Procedure, but also that Suez WTS contemporaneously transmitted a copy of the Solutions Procedure to Bulnes alongside his Offer Letter.  Bulnes does not proffer any rebuttal evidence to the contrary.

Accordingly, there appears to be only a modest degree of procedural unconscionability arising out of the standard adhesive nature of the Offer Letter and its Arbitration Provision.

### b.    Substantive Unconscionability

When the degree of procedural unconscionability of an adhesion contract is low, "the agreement will be enforceable unless the degree of substantive unconscionability is high." *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1263 (9th Cir. 2017). Substantive unconscionability focuses on the harshness and one-sided nature of the terms of the contract. *A&M Produce*, 135 Cal. App. 3d at 486–87. "Substantive unconscionability 'may take various forms,' but typically is found in the employment context when the arbitration agreement is 'one-sided' in favor of the employer without sufficient justification, for example, when 'the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration.'" *Serpa*, 215 Cal App. 4th at 703 (quoting *Little*, 29 Cal. 4th at 1071).

Bulnes avers the Arbitration Provision and the class waiver therein exhibit a high degree of substantive unconscionability. This Court disagrees

### i.    The Arbitration Provision

Bulnes argues the Arbitration Provision's mandate that he bring his minimum-wage and overtime-pay claims in an arbitral forum amounts to a waiver of his "unwaivable statutory right" to receive minimum wage and overtime pay.[10] (Opp'n at 11 (citing *Gentry v. Superior Court*, 42 Cal. 4th 443, 455 (2007) ("By its terms, the rights to legal minimum wage and legal overtime compensation conferred by the statute are unwaivable.")).) But "[a] party does not waive statutory rights by agreeing to arbitrate them," for, "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by statute." *Prima Donna Dev. Corp. v. Wells Fargo Bank, N.A.*, 42 Cal. App. 5th 22, 36 (2019). An agreement to arbitrate "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Id.* (quoting *Mitsubishi Motors v. Soler Chrysler-Plymouth*,

---

[10] As explained in more fulsome detail at *infra* Sec. III.B, the Court notes Bulnes effectively concedes by this argument that his Labor Code claims are Covered Claims within the meaning of the Solutions Procedure.

473 U.S. 614, 628 (1985).  It does not—without more—foreclose a plaintiff from vindicating substantive rights granted by federal and state law.

Still, where, as here, an arbitration provision allegedly "encompass[es] unwaivable statutory rights [it] must be subject to particular scrutiny[.]"  *Armendariz*, 24 Cal. 4th at 100.  In considering whether such a provision manifests substantive unconscionability, courts assess whether the underlying arbitration process:  (1) "provides for neutral arbitrators"; (2) "provides for more than minimal discovery"; (3) "requires a written award"; (4) "provides for all of the types of relief that would otherwise be available in court"; and (5) "require[s] employees to pay either unreasonable costs or any arbitrators' fee or expenses as a condition of access to the arbitration forum" ("*Armendariz* Factors").  *Beco v. Fast Auto Loans, Inc.*, 86 Cal. App. 5th 292, 309 (2022).

Bulnes only addresses the fourth *Armendariz* Factor.  (Opp'n at 12.)  Specifically, Bulnes argues the Labor Code would *mandate* that he be awarded attorneys' fees and costs were he to prevail in court on any one of his overtime, rest-period, and minimum wage claims. (Opp'n at 12 (citing Cal. Labor Code §§ 226(e)(1), 1194(a), & 2802(a), (c)).)  However, Bulnes interprets the Solutions Procedure to confer an arbitrator with discretion to issue attorney's fees and costs to a prevailing party, even when such an award is mandatory under the applicable law.  (*Id.*)  Suez WTS retorts Bulnes' interpretation is mistaken; if California law mandates attorneys' fees and costs with respect to a particular claim the Solutions Procedure requires arbitrators to follow the law and does not grant them a modicum of discretion otherwise.  (Reply at 9.)  The Court agrees Suez WTS' interpretation is the right one and, thus, there is no dispute Bulnes will be entitled to fees and costs should he ultimately prevail on at least one of his overtime, rest-period, or minimum-wage claims in arbitration under the Solutions Procedure.

The Solutions Procedure term entitled "Costs and Fees" states that "[e]ach party shall pay its experts' and/or attorneys' fees, unless the arbitrator awards reasonable experts' and/or attorneys' fees to a 'prevailing party' under applicable law."  (Solutions Procedure § III.D.28.)  And the Offer Letter provides the "applicable law" with respect to

- 33 -

Bulnes' prospective Covered Claims is California law.  (Offer Letter at 2; *see also* Solutions Procedure § III.D.25 ("The arbitrator shall interpret and apply the law of remedies of the . . . applicable law pursuant to any contractual agreement.").)  The Costs and Fees provision does not employ any discretionary language; it instructs arbitrators to follow the "applicable law."  Here, California law requires attorneys' fees and costs be awarded to a plaintiff who prevails on his or her claims brought under the Labor Code for failure to pay overtime wage, minimum wage, or rest period premiums.  *See* Cal. Labor Code §§ 226(e)(1), 1194(a), & 2802(a), (c).  The Solutions Procedure does not infringe upon a prevailing Covered Employee's entitlement to that mandatory award.

Accordingly, the Court rejects Bulnes' argument that the fourth *Armendariz* Factor here favors a finding of substantive unconscionability.  Because Bulnes does not proffer any other arguments as to any other *Armendariz* Factor, the Court finds Bulnes has failed to demonstrate the Arbitration Provision is substantively unconscionable.

### ii.      The Class Waiver

It is undisputed the Arbitration Provision contains a class waiver.  (Offer Letter at 1.)  That waiver also is nestled in a Solutions Procedure provision, which states:

> Covered Employees and the Company waive their right to bring any Covered Claims as, or against, a representative of a class or collective action (whether opt-in or opt-out) . . . unless all parties agree to do so in writing.  All Covered Claims must be brought on an individual basis only in Solutions.

(Solutions Procedure § I.K.)

Bulnes argues this class waiver is *per se* substantively unconscionable and renders unenforceable the parties' entire agreement to arbitrate.  He claims that California courts have reasoned class-action and class-arbitration bans are *per se* unconscionable in the wage-and-hour context.  (Opp'n at 13.) This argument is foreclosed by *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

"While the FAA permits certain contract-based defenses to enforcement, 'defenses that apply only to arbitration or that an agreement to arbitrate is at issue' are not

22cv1154

permitted." *Morvant v. P.F. Chang's China Bistro*, 870 F. Supp. 2d 831, 841 (N.D. Cal. 2012) (quoting *Concepcion*, 563 U.S. at 339).   Prior to *Concepcion*, under then-controlling California precedent, *Discover Bank v. Superior Court*, 36 Cal. 4th 148 (2005), a plaintiff seeking to enjoin enforcement of a class-arbitration waiver in an adhesion consumer contract could invalidate that provision on unconscionability grounds if he or she demonstrated (1) the disputes between putative class members "predictably involve small amounts of damages," and (2) "it is alleged that the party with superior bargaining power has carried out a scheme to deliberately cheat the numbers of consumers out of individually small sums of money."   In such instances, the *Discover Bank* court reasoned, class waivers become, in practice, an exculpatory clause contrary to California law.  *Id.* at 160–62.

Shortly after the Supreme Court of California decided *Discover Bank*, it addressed whether *class-action* waivers in employment agreements are substantively unconscionable in *Gentry v. Superior Court*, 42 Cal. 4th 443 (2007).  For similar reasons as those enunciated in *Discover Bank*, the *Gentry* court held "class action waivers in wage and hour cases and overtime cases [c]ould have, at least frequently if not invariably, a similar exculpatory effect."  42 Cal. 4th at 457 (citing *Discover Bank*, 36 Cal. 4th at 161).  While *Gentry* rested on public policy grounds, the *Gentry* court, too, looked to the "modest size of the potential for individual recovery," "the fact that absent members of the class may be ill informed about their rights," and "other real world obstacles" to the vindication of individual's unwaivable rights bestowed by the Labor Code as reasons to find class-action waivers in the employment context substantively unconscionable and, thus, unenforceable.  *Compare Discover Bank*, 36 Cal. 4th at 162 *with Gentry*, 42 Cal. 4th at 463.  In the years following *Discover Bank* and *Gentry*, California courts applied those precedents "frequently" in order to "find arbitration agreements unconscionable." *Concepcion*, 563 U.S. at 340–41 (collecting authorities).

In *Concepcion*, the Supreme Court took up the question whether the FAA preempted the *Discover Bank* rule.  563 U.S. at 340–41.  The *Concepcion* court answered

22cv1154

that question in the affirmative. Anchoring its decision in the FAA's "emodi[ment] [of] [a] national policy favoring arbitration," *id.* at 346 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)), the *Concepcion* court concluded the *Discover Bank* rule "stands as an obstacle to the accomplishment of the FAA's objective," and, thus, is "preempted by the FAA," *id.* at 353; *see also id.* at 348 ("The conclusion follows that class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA.").

While *Concepcion* explicitly abrogates the *Discover Bank*, it is silent as to *Gentry*. However, *Gentry* is no longer good law despite *Concepcion*'s silence. The Supreme Court of California concluded in 2014 that *Concepcion* invalidates not only the *Discover Bank* rule but also the *Gentry* rule. *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 360 (2014), *abrogated on other grounds*, *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022). As numerous of its sister tribunals have expounded, there is "no principled basis to distinguish between *Discover Bank*, which was expressly overturned in *Concepcion*, and *Gentry*." *See Morvant*, 870 F.2d at 840–41 ("Each decision looked to the modest size of individuals' potential recovery, unequal knowledge and bargaining powers in the contractual relationship, and other real world obstacles to vindication of the individuals' rights." (cleaned up)); *Truly Nolen of Am. v. Superior Court*, 208 Cal. App. 4th 487, 506 (2012) (holding that "[a]lthough *Gentry* and *Discover Bank* were founded on different theoretical grounds," the "expansive language" in *Concepcion* "and its clear mandate that arbitration provisions must be enforced according to their terms despite a state's policy reasons to the contrary . . ., we agree with those courts that have questioned the continuing validity of the *Gentry* standard to invalidate express arbitration waiver[s] contained in an employment arbitration agreement governed by the FAA"); *Piplack v. In-N-Out Burgers*, 88 Cal. App. 5th 1281, 1289 (2023) (opining that "when the United States Supreme Court issued *Concepcion*" it "effectively invalidated *Gentry*" (citing *Iskanian*, 59 Cal. 4th at 376)).

The Opposition clearly invokes *Discover Bank* and *Gentry* to invalidate the class waiver. Bulnes argues class waivers in the wage-and-hour context are unconscionable for the same reasons espoused in both *Discover Bank* and *Gentry*. (Opp'n at 13 (arguing class waivers are substantively unconscionable because "they:  (1) are patently unfair to potential plaintiffs who ma[y] only be owed a relatively small amount in recovery; and (2) provide security for the companies protected by the provision to avoid litigation or responsibility for their wrongful conduct.").)  Furthermore, Bulnes directly cites *Gentry*. (*Id.* at 11.)  Bulnes offers no other justification for finding the Arbitration Provision's class waiver unconscionable besides those invalidated by *Concepcion*.

Accordingly, Bulnes fails to prove the Arbitration Provision's class waiver is substantively unconscionable.

## B.   The Agreement to Arbitrate Covers the Instant Dispute

Having determined the Offer Letter, its Arbitration Provision, and the Solutions Procedure properly incorporated by reference therein comprise a valid and enforceable agreement to arbitrate, the Court now moves to the second line of inquiry:  whether the agreement to arbitrate between Suez WTS and Bulnes covers this action.  *See Lifescan, Inc.*, 363 F.3d 1012 (instructing district courts to compel arbitration if (1) there is a valid agreement to arbitrate *and* (2) that agreement covers the dispute).

"[U]nless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute," a court must defer to arbitration. *AT&T Techs*, 475 U.S. at 650.  "[D]oubts [about scope] should be resolved in favor of coverage."  *Id.*  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration" by showing "that the [arbitration] agreement does not cover the dispute."  *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000) (citation omitted).  "This is a high burden requiring [the plaintiff] to overcome strong federal policy" that favors "the general presumption of arbitration."  *Martin v. Cavalry, SPV I, LLC*, 2014 WL 1338702, at *10 (E.D. Ky. Mar. 31, 2014) (quoting *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004)

The Solutions Procedure mandates that "Covered Employee[s]" resolve "Covered Claims" pursuant to its terms.  (Solutions Procedure § II.K ("[Covered Employees] waive their right to bring any Covered Claims, as, or against, a representative or member or a class or collective action (whether opt-in or opt-out . . . ., unless all parties agree to do so in writing.   All Covered Claims must be brought on an individual basis only in Solutions."); *see id.* ("Covered Employees and the Company are not allowed to litigate a Covered Claim in any court.").)

The Complaint asserts 10 claims:  nine assert pervasive wage-and-hour violations under the Labor Code, and the tenth asserts those Labor Code violations amount to unlawful business practices in violation of the Business & Professions Code.  (Compl. ¶¶ 54–124.)  Bulnes does not dispute either that he is a Covered Employee or that each of the ten causes of action raised in his Complaint are Covered Claims.  (*See generally* Opp'n.)  Bulnes' silence alone authorizes this Court to find the entire dispute is covered by the parties' agreement to arbitrate.   However, an examination of the Solutions Procedure elucidates that Bulnes' action, in its entirety, is covered by his agreement with Suez WTS to arbitrate.[11]

The Solutions Procedure defines "Covered Employees" as "U.S.-based (or U.S. citizens working outside the United States) current, or former employees who left the Company after the effective date of Solutions, not represented by a labor union, who are or are or were employed by the Company[.]"  (Solutions Procedure § I.E.)  Appendix A of the Solutions Procedure further provides that July 1, 2008 is the "effective date of [the] Solutions Procedure."  (*Id.*, App. A.)  It is undisputed Bulnes became a Suez WTS employee in December 2019, well after the Solutions Procedure effective date.  (Bulnes Decl. ¶ 2.)  And the Solutions Procedure clearly reflects that Bulnes' exit from the

---

[11] The Court notes that neither the Offer Letter nor Solutions Provision contains a delegation clause.  In the absence of such contractual language, threshold issues of arbitrability are left for this Court to decide.  *See Warrior & Gulf Navigation Co.*, 363 U.S. at 584–85 ("In the absence of any express provision excluding a particular grievance from arbitration . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.").

company in March 2021 does not exempt him from Covered Employee status.  (*See* Solutions Procedure § I.E.)  Furthermore, Bulnes does not attest he was represented by a labor union at any time during his employment.  Thus, Bulnes is a Covered Employee under the Solutions Procedure and, therefore, must arbitrate "Covered Claims."

"Covered Claims" are broadly defined by the Solutions Procedure.  They include "all claims that arise or arose out of or are related to an employee's employment . . ." (Solutions Procedure § II.I.)  Below this sweeping definition is a non-exhaustive list of types of Covered Claims that provides a higher level of granularity as to the meaning of "Covered Claims."  (*See id.* § II.J.)  Among those Covered Claims are "[c]laims relating to compensation."  (*See id.*)  This wording plainly covers Bulnes' wage-and-hour claims, all of which relate to Suez WTS' alleged failure to adequately compensate Bulnes during his employment.  *See Galarsa v. Dolgen Cal., LLC*, 88 Cal. App. 5th 639, 650–51 (2023) (holding contractual language "requiring arbitration of disputes arising out of [plaintiff's] employment [with defendant . . . plainly covers . . . the Labor Code violations allegedly suffered by plaintiff").  Bulnes' unlawful business practices claim is clearly a Covered Claim, too.  "To require arbitration, [Bulnes'] factual allegations need only 'touch matters' covered by the contract containing the arbitration clause and all doubts are to be resolved in favor of arbitrability."  *Simula*, 175 F.3d at 721.  Bulnes' unfair business practices claim is predicated entirely upon the alleged Labor Code violations he purportedly suffered (*see* Compl. ¶ 121), and, therefore, Bulnes' tenth claim "touch[es] matters" that clearly amount to Covered Claims.  *See Silva v. Darden Rests., Inc.*, No. 2:17-CV-5663-ODW (E), 2018 WL 3533364, at *5 (C.D. Cal. July 20, 2018) (finding plaintiff's wage-and-hour claims covered as "employment-related disputes" and, therefore, plaintiff's derivative unlawful and unfair business practices claim "ensnared by the arbitration clause as well").

Accordingly, this Court has no difficulty concluding the parties' agreement to arbitrate covers the whole dispute.

22cv1154

## C.     The Federal Arbitration Act Applies to the Parties' Agreement

Sections 3 and 4 of the FAA give the Court "considerable" power to compel arbitration, but that power is circumscribed by antecedent statutory provisions of the FAA. *See New Prime*, 139 S. Ct. at 537.  As explained by Justice Gorsuch in *New Prime*:

> Section 2 provides that the [FAA] applies only when the parties' agreement to arbitrate is set forth as a "written provision in any maritime transaction or a contract evidencing a transaction involving commerce."  And § 1 helps define § 2's terms.  Most relevant for our purposes, § 1 warns that "nothing" in the [FAA] "shall apply" to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

*Id.* at 537 (alterations added).  Before ordering arbitration, a court "should decide for itself" whether the agreement to arbitrate at issue is excluded from the FAA by Sections 1 and/or 2. *Id.*  "After all, to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2." *Id.*

Bulnes argues his specific agreement to arbitrate with Suez WTS falls outside the scope of both Sections 1 and 2 of the FAA.  The Court addresses both of Bulnes' arguments, which it finds unavailing for the reasons stated below.[12]

### 1.     Transportation-Worker Exemption

Section 1 exempts from the FAA "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  Interpreting that statutory language in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001), the Supreme Court endorsed the view held by most appellate courts at the time, and ruled that Section 1 "exempts from the FAA only contracts of employment of transportation workers," as opposed to contracts of employment as a

---

[12] Suez WTS avers the "Solutions Procedure clearly states it is 'an agreement to arbitrate pursuant to the Federal Arbitration Act (FAA).'"  (Reply at 5.)  But parties to a contract containing an arbitration provision cannot simply stipulate to the FAA's applicability; its applicability is policed by Sections 1 and 2.

generalized category.  *See id.* ("[T]he location of the phrase 'any other class of workers engaged in . . . commerce' in a residual provision, after specific categories of workers have been enumerated, undermines any attempt to give the provision a sweeping, open-ended construction.").

In the Ninth Circuit, a "transportation worker" is one whose job duties are more than "tangentially related to [the] movement of goods."  *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 911 (9th Cir. 2020) (adopting the view of, *inter alia*, the Eighth Circuit espoused in *Lenz v. Yellow Transportation, Inc.*, 431 F.3d 348, 351–52(2005)).   To qualify, a worker need not cross state lines as part of his or her employment.  *Id.* at 910–11.  Rather, the transportation worker exemption can also apply to "worker[s] employed to deliver goods that originate out-of-state to an in-state destination[.]"  *Id.* at 910 (citing *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13, 17–23 (1st Cir. 2020); *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers of Am., (U.E.) Local 437*, 207 F.2d 450, 452 (3d Cir. 1953)). The burden of proving the transportation worker exemption applies rests with the party opposing arbitration.  *See, e.g.*, *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."); *accord Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 928 (2020).

Rather than even attempt to establish the applicability of the transportation-worker exemption, the Opposition instead merely points out its existence, thereby insinuating the burden rests upon Suez WTS' to show its inapplicability.  Again, Bulnes' failure to articulate arguments and proffer supporting proof warrants rejection of this challenge by itself.  Moreover, the record does not provide any support for the notion Bulnes qualified as a "transportation worker" during his time at Suez WTS.  The parties agree Bulnes performed his duties as a Service Technician inside California only.  (Bulnes Decl. ¶ 2; Couch Decl. ¶ 5.)  And there is nothing in the record that suggests Bulnes' duties as a Service Technician even incidentally entailed the movement of goods originating from out-of-state.  *See Rittmann*, 971 F.3d at 910–13.

- 41 -

1   Accordingly, this Court rejects Bulnes' contention the transportation-worker
2   exemption prohibits it from ordering Bulnes' claims to arbitration.

3   **2.    "A Contract Evidencing A Transaction Involving Commerce"**

4   Section 2 limits the scope of the FAA by restricting its applicability to only "a
5   written provision in any maritime transaction or," more relevant in the instant case, "a
6   contract evidencing a transaction involving commerce."  9 U.S.C. § 2.  "As the Supreme
7   Court has noted, although the statute refers to commerce generally, it actually covers
8   contracts evidencing transactions affecting '*interstate* commerce.'"  *Breazeale v. Victim*
9   *Servs., Inc.*, 198 F. Supp. 3d 1070, 1075 (N.D. Cal. 2016) (emphasis added) (citing
10  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995)).

11  Without support, Bulnes asserts the Offer Letter, including the Arbitration
12  Provision, has no connection to interstate commerce because he carried out his
13  employment exclusively within the confines of California.  (Opp'n at 7.)  Bulnes'
14  assertion is incongruent with Congress' intent in enacting the FAA, which was "to
15  provide for the enforcement of arbitration agreements within the *full reach* of the
16  Commerce Clause."  *Perry v. Thomas*, 482 U.S. 483, 490 (1986) (emphasis added).
17  Supreme Court precedent "firmly establishes Congress' power [under the Commerce
18  Clause] to regulate purely local activities that are part of an economic 'class of activities'
19  that have a substantial effect on interstate commerce."  *Gonzales v. Raich*, 545 U.S. 1, 7
20  (2005).

21  There is ample support in the record to find the Offer Letter affects interstate
22  commerce.  While it is undisputed Bulnes worked only in California, his former
23  employer, Suez WTS, is headquartered in Virginia, is operated by a parent company with
24  a principal place of business in Pennsylvania, and, most importantly, and maintains a
25  business designing, installing, and maintaining water filtration systems "throughout the
26  United States." (Couch Decl. ¶¶ 7–8.)  The cross-border nature of Suez WTS' business is
27  a sufficient basis to find the Offer Letter evidences a transaction involving commerce,
28  despite Bulnes' own employment duties being geographically limited.  *Cf. Bonner v.*

- 42 -

*Mich. Logistics Inc.*, 250 F. Supp. 3d 388, 396–97 (D. Ariz. 2017) (finding Arizona delivery drivers were involved in "interstate commerce" for the purpose of Section 1 but not Section 2 of the FAA); *accord GGNSC Louisville St. Matthews v. Madison*, 254 F. Supp. 3d 901 (W.D. Ky. 2017) (finding contract between resident and nursing home affected interstate commerce because nursing home's operator did business in eight different states).

Accordingly, the FAA applies to the parties' agreement to arbitrate as set forth in the Offer Letter and the Solutions Procedure incorporated by reference therein.

### D. Stay and Dismissal

Suez WTS asks this Court to dismiss Bulnes' putative class-action claims. (Mot. 13.) Under the FAA, where, as here, a court "determines that all of the claims raised in the action are subject to arbitration," the court may either "stay the action or dismiss it outright." *Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014). "The Ninth Circuit has suggested, without expressly holding, that a class encompassing members with valid arbitration agreements, and others not subject to the arbitration agreements, cannot be certified." *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964 (citing *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1094 (9th Cir. 2018)). Given this Court's decision to grant Suez WTS' request to compel arbitration, Bulnes cannot continue to serve as class representative of the putative class.

Accordingly, the Court dismisses Bulnes' putative class-action claims, but without prejudice. Bulnes' inadequacy as a class representative does not speak to the merits of the class claims.

//
//
//
//
//
//

- 43 -

## IV.   CONCLUSION

In light of the foregoing, the Court **GRANTS** Suez WTS' Motion.  (ECF No. 13.) Specifically, the Court **ORDERS** the parties to proceed to arbitration with the claims pressed in the Complaint in the manner provided for in the Arbitration Provision and Solutions Procedure, and **DISMISSES** without prejudice Bulnes' putative class-action claims.  The Clerk of Court is **DIRECTED** to close this case.

**IT IS SO ORDERED.**

DATED: May 4, 2023

Hon. Cynthia Bashant
United States District Judge

22cv1154